UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES H. EMMONS,

        Plaintiff,                        Civil Action No. 2:12-15235

        v.                             District Judge Denise Page Hood
                                         Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION TO
DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [15] AND
GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [19]**

        For many years, Plaintiff James Emmons worked for a tool and die company. Since October 2008, however, Emmons has not worked. The reason, he says, is that he is disabled by various physical impairments including pain and swelling in his legs, carpal tunnel syndrome, shortness of breath, and low-back pain. Emmons therefore applied for disability benefits from the Social Security Administration. On behalf of Defendant Commissioner of Social Security, an administrative law judge held a hearing, reviewed Emmons' medical evidence, and concluded that Emmons was not under a "disability" as that term is used in the Social Security Act. Emmons challenges that conclusion here. For the reasons set forth below, this Court finds that the ALJ did not reversibly err in assessing Emmons' credibility and that substantial evidence supports the ALJ's decision. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 15) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 19) be GRANTED, and that the decision of the Commissioner be AFFIRMED.

**I. BACKGROUND**

    **A. Procedural History**

In April 2010, Emmons applied for period of disability and disability insurance benefits. (Tr. 23.) In his application, he asserted that he became disabled on October 31, 2008. (*Id.*) After the Social Security Administration denied Emmons' application on initial review, Emmons requested a hearing before an administrative law judge. (*Id.*) Emmons was granted his hearing and testified before Administrative Law Judge Ronald Herman in August 2011. (Tr. 35-55.) On September 14, 2011, ALJ Herman concluded that Emmons was not under a "disability" as that term is used in the Social Security Act. (Tr. 23-31.) Emmons then sought further administrative review, but the Social Security Administration's Appeals Council denied Emmons' request. (Tr. 5.) This suit followed. (Dkt. 1, Compl.)

    **B. Medical Evidence**

As noted, Emmons asserts that he became disabled on October 31, 2008. (Tr. 23.) Although the administrative record includes evidence from as early as 2001, the Court only summarizes those medical records that are relevant to Emmons' condition during the disability period that ALJ Herman adjudicated.

In May 2007, Emmons underwent a pair of diagnostic tests. (Tr. 216.) A radiologist who performed a chest x-ray "suspect[ed] underlying interstitial lung disease." (*Id.*) A different physician performed a venous doppler study of Emmons' right leg. (Tr. 217.) That physician opined: "[e]dema of the distal thigh and lower leg. However, no deep venous thrombosis is noted. 1.5 centimeters lymph node in the right groin." (*Id.*)

The administrative record is then silent until August 2010. That month, Dr. R. Scott Lazzara

examined Emmons for Michigan's Disability Determination Service, a state agency that helps the Social Security Administration evaluate disability claimants. (Tr. 248-52.) Emmons told Dr. Lazzara that arthritis in his knees, feet, and hands had affected him for 15 years. (Tr. 248.) He attributed this to "repetitious work doing tool and die." (*Id.*) Emmons also complained of numbness, tingling, and throbbing pain in his feet. (*Id.*) He further explained that he had been experiencing shortness of breath for seven years. (*Id.*) Emmons thought he could sit for about 30 minutes, stand for about an hour, and walk for about 100 feet before becoming winded. (*Id.*) On examination, Dr. Lazzara found that Emmons' expiratory phase was "prolong[ed]" but that his breath sounds were "clear to auscultation" and "symmetrical." (Tr. 249.) In terms of Emmons' lower extremities, Dr. Lazzara remarked, "There is +2 pitting edema and mild varicose veins present. The femoral, popliteal, dorsal pedis, and posterior tibial pulses are diminished bilaterally." (*Id.*) In terms of Emmons' hands, Dr. Lazzara found that Emmons' grip strength was "intact" and his dexterity "unimpaired." (*Id.*) The state-agency physician concluded by making two findings:

> 1. Shortness of breath.
>
> The patient did have findings of some mild obstructive disease today. . . . Contributing to this has been his body habitus and weight loss would be helpful.
>
> 2. Arthritis.
>
> Again, most of this appears to be due to wear and tear. He did have diminished range of motion in multiple joints and synovial thickening in his wrists [but] his dexterity was well preserved.

(Tr. 251-52.)

About a month later, Dr. Lazzara performed another evaluation of Emmons; this one focused on Emmons' shortness of breath. (Tr. 256-58.) Emmons reported chronic shortness of breath for

3

seven years and chronic exposure to "grinding metal." (Tr. 256.) Dr. Lazzara noted, apparently based on Emmons' reporting, that radiographs had shown some scarring at the bases of Emmons' lungs. (*Id.*) Additionally, Dr. Lazzara noted that Emmons had smoked about a half pack of cigarettes per day for 25 years. (*Id.*) Dr. Lazzara measured Emmons' forced expiratory volume and forced vital capacity and then completed a pulmonary function report. (Tr. 257-58.) His impression was that Emmons had emphysema but also "appear[ed] to have relatively well preserved lung function." (Tr. 258.) Emmons' "lung fields sounded relatively clear" but he did have "some mild prolonged expiratory phase." (*Id.*)

In January 2011, Emmons was treated for lower-extremity edema at the Cedar Run Family Medicine Center. (Tr. 279.) Although the signature provides no hint as to the associated name, given the source of the records, it appears that Emmons was treated by Dr. Thomas Laskey. (*See* Tr. 279, 294.) Dr. Laskey noted that Emmons' toes were blue, his nails yellow, and that Emmons reported claudication: "pain caused by too little blood flow during exercise . . . that generally affects the blood vessels in the legs." (Tr. 279); Mayo Clinic Website, *Claudication*, http://www.mayoclinic.com/ health/claudication/DS01052 (last visited Nov. 5, 2013). Emmons also told Dr. Laskey that he had shortness of breath. (Tr. 279.) Although Dr. Laskey's notes are difficult to decipher, it appears that Emmons thought that it was his legs that caused him to stop walking and that he thought his obesity contributed to his problems. (*See* Tr. 279.) (Emmons then weighed 295 pounds. (*Id.*)) On exam, Dr. Laskey found no edema in Emmons' extremities. (*Id.*) He diagnosed lower-extremity edema or peripheral vascular disease and ordered diagnostic testing. (*Id.*) He also diagnosed "chest pain" and hyperlipidemia. (*Id.*)

On February 2 and February 3, 2011, Emmons underwent three tests. (Tr. 287-88, 289, 290.)

One was a lower-extremity arterial study, both at rest and after exercise. (Tr. 289.) The testing physician's impression was that the study "suggest[ed] mild obstructive vascular disease in both the right and left legs," but that the level of obstruction could not be "clearly identified" from the study. (Tr. 289.) The physician also noted that Emmons' "non-compressib[le]" femoral vasculature suggested "atherosclerotic disease in these vessels." (*Id.*) Second was a "nuclear cardiolite stress study." (Tr. 290.) The study physician noted normal myocardial perfusion, "[a]dequate cardiac stress test," and a "[n]ormal ECG response to exercise." (*Id.*) The physician also noted, however, that Emmons' exercise capacity was "poor" and that the test was "terminated due to dyspnea." (*Id.*) Emmons also underwent a transthoracic echocardiogram. (Tr. 287.) The testing physician's impression was "normal left ventricular size and wall thicknesses, with normal systolic function" but a "[s]everely dilated left atrium." (*Id.*)

In February 2011, Emmons returned to Dr. Laskey; the physician noted that the stress test and echocardiogram were "OK." (Tr. 278.) But Emmons reported that his leg pain was limiting his daily activities and Dr. Laskey noted bilateral peripheral vascular disease on both legs and that Emmons' legs were "purple/hairless." (Tr. 278.) Dr. Laskey also wrote "1-2+ pe b/l," which, apparently, means that Emmons had 1 to 2+ pitting edema in both legs. (*Id.*) Dr. Laskey's assessment was lower-extremity cyanosis. (Tr. 278.) Cyanosis is "a bluish color to the skin or mucus membranes that is usually due to a lack of oxygen in the blood." Medline Plus. *Skin Discoloration - Bluish*, http://www.nlm.nih.gov/medlineplus/ency/article/003215.htm (last visited Nov. 5, 2013). Emmons was to undergo a magnetic resonance angiogram (MRA) and have a vascular consult with Dr. William Ranger. (Tr. 278.)

The MRA, taken in February, revealed that Emmons' legs had "normal runoff." (Tr. 282.)

5

Emmons' "[s]uperficial, popliteal, and trifurcation vessels [were] patent bilaterally" and there was "[n]o evidence of stenosis or occlusion." (Tr. 282.)

In March 2011, Dr. Ranger evaluated Emmons. (*See* Tr. 265-66.) Following his examination, Dr. Ranger wrote to Dr. Laskey:

> I told [Mr. Emmons], given the severity of the venous disease identified on his physical exam and his symptomatic discomfort, I am going to recommend that he be placed in Jobst compression stockings, 20-30 mmHg. . . . I also went over leg elevation with him. I also placed him on aspirin, 81 mg a day. Given the severity of his venous disease, I told him I would recommend that he undergo a special venous ultrasound to determine the level and severity of his venous disease, and whether or not any endovenous treatment is an option that should be considered. In the meantime, I would continue aggressive compression stockings and risk factor control. I recommended that he remain on his antiplatelet therapy.

(Tr. 266.)

Later in March, Emmons underwent a venous duplex ultrasound. (Tr. 268.) The study physician's impression was that Emmons' "femoral veins bilaterally and the left great saphenous vein [were] incompetent." (Tr. 268.) Emmons, however, had no deep vein or superficial vein thromboses. (*Id.*)

Emmons returned to Dr. Ranger in April 2011. (Tr. 262.) The medical specialist noted, "Mr. Emmons has now used his compression stockings for over six weeks with no improvement in his symptoms of pain and swelling." (Tr. 262.) Dr. Ranger believed that Emmons was a candidate for "laser endovenous treatment." (*Id.*)

Emmons also saw Dr. Laskey in April for dizziness when blowing his nose and bilateral hand pain. (Tr. 277.) Dr. Laskey prescribed Antivert for Emmons' dizzy spells and ordered an EMG to rule out carpal tunnel syndrome. (*Id.*)

In May 2011, Emmons had an electrodiagnostic consultation with Dr. Julie Gronek. (Tr. 271-72.) Emmons told Dr. Gronek that he had experienced abnormal sensations and pain in his hands for a number of years, but that it had become more problematic in the last year and a half. (Tr. 271.) "He now is dropping things. He is weak. He is discoordinated. He has recurrent symptoms when he drives or holds his hand up over his head. The symptoms do awaken him from sleep at night." (Tr. 271.) Dr. Gronek noted, however, that Emmons did not have significant leg pain. (Tr. 271.) After performing an EMG, Dr. Gronek's impression was that Emmons had "symptomatic carpal tunnel syndrome." (Tr. 272.) She opined, "The severity of the mononeuropathy is moderate, slightly worse on the right than on the left. I suspect that he would benefit from decompressive surgery at the wrist." (*Id.*)

Later in May, Emmons underwent a different surgery—the one recommended by Dr. Ranger. (Tr. 261.) In particular, Dr. Ranger performed an endovenous laser ablation of Emmons' left greater saphenous vein to help treat symptoms arising from Emmons' varicose veins in his left leg. (*Id.*) At a follow-up three days later, a nurse practitioner in Dr. Ranger's office noted that an ultrasound showed a successful closure of the left greater saphenous vein and no evidence of deep vein thrombosis. (Tr. 261.) She advised Emmons to take anti-inflammatory medication and to elevate his leg. (*Id.*)

Emmons saw Dr. Laskey in July 2011 for an ear problem and dizziness, shortness of breath, and chronic low-back pain. (Tr. 276.) Regarding Emmons' dizzy spells, Dr. Laskey's assessment was "eust[achian] tube dysf[unction] vs [benign positional vertigo] vs Meniere's disease." (Tr. 276.) Dr. Emmons prescribed modified Epley (exercises used to treat benign positional vertigo) and Fluticasone (a corticosteroid used to treat asthma). (*Id.*) For Emmons' shortness of breath, Dr.

7

Laskey prescribed Albuterol. (*Id.*) After examining Emmons' back, and apparently noting reduced range of motion or pain with certain movements, Dr. Laskey ordered an MRI. (*Id.*)

The July 2011 low-back MRI revealed "[m]ild degenerative changes of the facets at L4-5 and L5-S1." (Tr. 297.) There was also "minimal" encroachment of Emmons' right neural foramina at L4-5. (Tr. 298.)[1] The study was otherwise "unremarkable." (Tr. 298.) The same day in July, an MRI was taken of Emmons' brain to investigate his dizzy spells; the radiologist saw only "[m]inimal mucosal thickening in the mastoid air cells." (Tr. 296.) (Mastoid air cells are small cavities in the mastoid process; the mastoid process is part of the temporal bone behind the ear. Webster's Third New International Dictionary 1391 (3d ed. 1993).)

### C. Testimony at the Hearing Before the ALJ

At his August 2011 hearing before ALJ Herman, Emmons described his various impairments. (Tr. 41.) As to his shortness of breath, Emmons testified, "If I lift, I get out of breath. I have to sit down. Walking, I get out of breath." (Tr. 42.) Emmons did not know the cause of his shortness of breath, but did say that when he lifted items "that's when it gets really bad." (Tr. 43.) He also explained, "when I talk a lot I get out of breath." (*Id.*) Emmons thought, however, that he could lift a computer in the range of 10 to 20 pounds from one room to another without having problems. (*Id.*)

---

[1]The spinal column is comprised of vertebrae separated by discs that act as cushions between the vertebrae. The *central canal* of the spinal column conveys the spinal cord. At each disc level, e.g., C6-C7, a pair of spinal nerves exit the canal via *neural foramen* and thereby pass into the arms or legs. Joseph T. Alexander, M.D., Assistant Professor of Neurosurgery for Mayo Medical School, Lumbar Spinal Stenosis: Diagnosis and Treatment Options (June 1999); The Cleveland Clinic, Lumbar Canal Stenosis, http://my.clevelandclinic.org/disorders/Stenosis_Spinal/ hic_Lumbar_Canal_Stenosis.aspx (last visited Nov. 12, 2013); Randy Shelerud, Mayo Clinic Physical Medicine Specialist, Herniated Disk, http://www.mayoclinic.com/health/ bulging-disk/AN00272 (last visited Nov. 12, 2013).

Emmons also testified about his lower-leg edema. (Tr. 42.) He explained that when walking his legs would "swell up" and that he could not walk "very long" or stand "very long." (*Id.*) Emmons said, "When I sit, they pool. They get numb." (*Id.*) Emmons also stated that his feet would "swell up so bad" that bending them "hurt." (Tr. 45.) He told ALJ Herman: "My legs, they numb up and get tight and sore and hurt and throb. I don't sleep very well at night because of it sometimes." (Tr. 49.) Emmons stated that his leg pain was "eas[ily]" an eight on a one-to-ten pain scale. (Tr. 48.)

Emmons also explained that his carpal-tunnel syndrome caused pain at the eight-out-of-ten level. (Tr. 48.) "My hands hurt so bad, I can't even [wash my hair], that's how bad they are. If I go on the computer for any length of time meaning 10-15 minutes, my hands lock up. If I drive a car, they lock up on the steering wheel." (Tr. 44.)

Emmons described his ability to function. When asked how far he could walk, Emmons replied, "It varies, 100 feet, 200 feet. I can't really give an answer to that. Not very long. Not like I used to. Not like I should." (Tr. 44.) When asked what he did on a typical day, Emmons answered:

> Not too much anymore. I do some dishes. I put them in the dishwasher, not very much. The daughter does most of it. Cook some food. What I don't do, she does. As far as outside work, I really don't do anything. I sit on the ride-along mower and do a little bit at a time, what I can do. That's about it. I just can't do nothing. I can't even go walk with the dogs anymore without being out of breath.

(Tr. 44.)

After listening to Emmons' testimony, the ALJ asked a vocational expert to testify as to whether there would be jobs available for someone with functional limitations that the ALJ thought approximated Emmons'. In particular, ALJ Herman asked the vocational expert to consider a hypothetical individual capable of lifting up to 10 pounds "occasionally," standing or walking for

9

a total of two hours during an eight-hour workday, sitting for the remainder, and with the option to sit or stand at will; the ALJ added that the individual would not be required to climb ropes, ladders, or scaffolds, or be exposed to noxious fumes, odors, or gases. (Tr. 51.) The vocational expert thought that there were jobs within these limitations. (Tr. 52.) In particular, the expert thought that the hypothetical individual could work as a surveillance system monitor, an order clerk, or a charge account clerk. (Tr. 52.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

ALJ Herman applied this sequential analysis as follows. At step one, he found that Emmons had not engaged in substantial gainful activity since the alleged disability onset date of October 31, 2008. (Tr. 25.) At step two, he found that Emmons had the following severe impairments: emphysema, shortness of breath, carpal tunnel syndrome, leg pain, and depression. (*Id.*)[2] Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 26-27.) Between steps three and four, the ALJ determined that Emmons had the residual functional capacity to

> perform sedentary work as defined in 20 CFR 404.1567(a) except he can lift ten pounds occasionally and lesser weight more frequently. He can stand and/or walk two hours in an eight-hour workday and sit six hours in an eight-hour workday. The claimant would require a sit/stand option at will provided he is not off his work task more than 10 percent of the workday. He cannot climb ladders, ropes, or scaffolds. The claimant should avoid noxious fumes, odors, gases and pulmonary irritants (meaning working in a clean air environment).

(Tr. 28.) At step four, the ALJ found that Emmons was unable to perform any past relevant work. (Tr. 30.) At step five, the ALJ, relying on vocational-expert testimony, found that sufficient jobs

---

[2]At the hearing, Emmons testified that the limiting effects of his physical impairments made him feel depressed. (Tr. 46.) Emmons has not received treatment for his depression. (*Id.*) Moreover, Emmons' appeal to this Court is not based on his depression.

11

existed in the national economy for someone of Emmons' age (46 on the alleged onset date), education, work experience, and residual functional capacity. (Tr. 30-31.) The ALJ therefore concluded that Emmons was not under a "disability" as defined by the Social Security Act from the alleged onset date through the date of his decision, September 14, 2011. (Tr. 31.)

### III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is

limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV. ANALYSIS

Emmons primarily claims that ALJ Herman committed reversible error in discounting his credibility. (Pl.'s Mot. Summ. J. at 5-6.) Although the ALJ's reasons for doing so are not well articulated, this Court nonetheless finds no error justifying remand.

Emmons says that the ALJ should have fully credited his testimony about his "pain and swelling in his lower extremities." (Pl.'s Mot. at 5.) In support of this assertion, after reciting some of the medical evidence summarized above, Emmons provides this information:

> Although Plaintiff underwent a procedure to attempt to open the veins in his leg, he continued to report pain and swelling. (R. 261). During this time, Plaintiff was undergoing physical therapy to decrease the discomfort in his legs, but developed painful draining ulcers as a result of the severe edema in his lower extremities. (R. 324). In order to decrease the swelling, Plaintiff was ordered to use a sequential pump two times a day for one hour that manually drained fluid from his legs. (R. 303). He was also advised by his physical therapy team to elevate his legs above heart level multiple times a day to control his edema. *Id.* Plaintiff's medical records no[t] only document his painful conditions, but also his willingness to undergo different procedures. Despite painful, leaking ulcers on both of his legs, Plaintiff continued to attend physical therapy as instructed. Moreover, Plaintiff's swelling increased so much, he began to use a

> manual pump to drain the fluid from his legs. Therefore, Plaintiff's medical records clearly support a finding that he experiences debilitating pain and swelling in his lower extremities and therefore would be unable to work.

(Pl.'s Mot. Summ. J. at 5-6.)

The foregoing is persuasive: it suggests that Emmons' edema was more severe than perhaps appreciated by the ALJ. But the problem for Emmons is that the Court may not consider it. In particular, the records to which Emmons refers, although now part of the administrative record, were not part of the record before ALJ Herman. Where, as here, the Appeals Council denies a claimant's request for further administrative review, it is the ALJ's decision that is the final decision of the Commissioner of Social Security. *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, it is the ALJ's decision that this Court reviews for error. *See id.* In making that determination, the Court looks at the same evidence that the ALJ did. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) ("[T]his court has repeatedly held that evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review."); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir.1996) ("[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision.").

Turning, therefore, to the evidence this Court may consider, it does not show that the ALJ reversibly erred in discounting Emmons' testimony about his lower-extremity edema. Emmons stresses that he "testified that he is unable to sit or stand for any extended period of time before his lower limbs swell to excess." (Pl.'s Mot. Summ. J. at 8.) But the ALJ limited Emmons to work requiring at most two hours of standing or walking during an eight-hour day with the freedom to sit

and stand at will. (Tr. 28.) To the extent that Emmons testified that his lower-extremity pain and swelling prevented even this level of sitting, standing, and walking, substantial evidence supports the ALJ's decision to not fully credit it.

Based on the administrative record, Emmons first sought treatment for lower-extremity edema in May 2007. (Tr. 217.) Yet Emmons continued to work in a more demanding job than what the ALJ thought Emmons could do until October 2008. (*See* Tr. 40-41, 51.) Then, from the alleged disability onset date of October 31, 2008 until January 2011—more than two years—there is nothing suggesting that Emmons sought any treatment for his edema. (*See* Tr. 279.) This supports the ALJ's statement that Emmons' "treatment has been routine and conservative in terms of his physical conditions." (Tr. 29.) And the medical records after January 2011, at least those before ALJ Herman, do not lend strong support to Emmons' claims of disabling pain and swelling. A lower-extremity arterial study from February 2011 suggested only "mild" obstructive vascular disease. (Tr. 289.) An MRA, also from February 2011, revealed that Emmons' "[s]uperficial, popliteal, and trifurcation vessels [were] patent bilaterally" and there was "[n]o evidence of stenosis or occlusion." (Tr. 282.) It is true that in March 2011, a venous duplex ultrasound revealed that Emmons' "femoral veins bilaterally and the left great saphenous vein [were] incompetent." (Tr. 268.) But in May 2011, Emmons underwent a successful closure of the left greater saphenous vein. (Tr. 261). Following this procedure, the record before ALJ Herman did not indicate any further treatment for, or complaints related to, Emmons' lower-extremity edema. Instead, in July 2011, Emmons primarily complained of dizziness, shortness of breath, and low-back pain. (Tr. 276, 296-98.) Considering all of this, along with Emmons' statement that he could walk up to 200 feet, Emmons has not shown that it was unreasonable for the ALJ to have discounted his testimony implying that his lower-extremity pain

and swelling prevented him from performing the sitting, standing, and walking requirements of sedentary work with the benefit of a sit-stand option. *See Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 488 (6th Cir. 2005) ("Claimants challenging the ALJ's credibility findings face an uphill battle."); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) (providing that a court is "to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [a court does] not, of observing a witness's demeanor while testifying").

Seeking to further establish that the ALJ erred in discounting his credibility, Emmons points out that he "complain[ed] of pain in his lumbar spine as well as his bilateral hands." (Pl.'s Mot. Summ. J. at 6.) He implies that the following evidence supports his testimony about his low-back and hand conditions:

> An MRI performed on July 16, 2007 showed that Plaintiff suffered with degenerative changes of the facets at L4-5 and L5-S1 with some encroachment at L4-5. (R. 297-298). Further, studies performed on May 16, 2011 revealed that Plaintiff suffered from symptomatic carpal tunnel syndrome with moderate mononeuropathy – worse on the right than on the left. (R. 272).

(Pl.'s Mot. at 6.)

This evidence does not show that the ALJ reversibly erred in evaluating Emmons' hearing testimony. As to Emmons' statements about his lower back, the ALJ reasoned, "The claimant alleged other complaints related to his back pain however there were no significant objective medical findings in the record to support the degree of limitation (7F/2)." (Tr. 26.) This was a reasonable conclusion. Exhibit "7F/2" refers to the same evidence Emmons cites, an MRI report found at "R. 297-298." The report says that at L1-2, L2-3, and L3-4, Emmons' spine was "[u]nremarkable." (Tr. 297.) It provides that Emmons had "[m]ild" degenerative changes in the L4-5

facet joints but that there was no stenosis of the spinal column and only "mild" stenosis of the neuroforamina on the right. (Tr. 297.) Similarly, at L5-S1, the MRI revealed only "mild" degenerative changes without disc pathology, central canal stenosis, or significant neuroforaminal stenosis. (*Id.*) The MRI report therefore largely speaks for itself: its "mild" and "unremarkable" findings do not demonstrate that the ALJ unreasonably rejected Emmons' testimony to the extent it was inconsistent with performing a limited range of sedentary work.

Similar reasoning applies to Emmons' reliance on his EMG report. (*See* Pl.'s Mot. at 6.) In August 2010, Dr. Lazzara found that Emmons' grip strength was "intact" and his dexterity "unimpaired." (Tr. 249; *see also* Tr. 251-52.) No medical professional offered a contrary opinion. This includes Dr. Gronek. She "suspect[ed]" that Emmons would benefit from surgery but also believed that the severity of Emmons' mononeuropathy was only "moderate." (Tr. 272.) She did not opine on Emmons' ability to function with his hands. (*See* Tr. 271-72.) Given this evidence, it was not unreasonable for the ALJ to conclude that "the record is devoid of evidence of an inability to perform fine and gross movements effectively." (Tr. 26.) It follows that it was not unreasonable for the ALJ not to fully credit Emmons' testimony that he had eight-out-of-ten hand pain and that his hands would "lock up" after spending 10 to 15 minutes on the computer. (*See* Tr. 28-29, 44.)

Emmons also cites *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007) to argue that "the ALJ . . . improperly used Plaintiff's daily activities to undermine his credibility." (Pl.'s Mot. at 6.) To the extent that Emmons implies that *Rogers* prohibits an ALJ from considering a claimant's daily functioning in evaluating credibility, the Court disagrees. The Sixth Circuit only said that "minimal daily functions are not comparable to typical work activities," *Rogers*, 486 F.3d at 248, which is not the same as saying that daily activities cannot be considered. In fact, the

17

Administration's regulations explicitly direct an ALJ to consider daily functioning in assessing credibility. 20 C.F.R. § 404.1529(c)(3) ("Factors relevant to your symptoms, such as pain, which we will consider include: (i) Your daily activities . . . .").

Emmons also argues that substantial evidence does not support the ALJ's step-five conclusion that there were jobs available that Emmons could perform. (Pl.'s Mot. Summ. J. at 7-9.) To make this step-five finding, the ALJ relied on vocational expert testimony. (Tr. 31.) Emmons, however, maintains that he is more limited than the hypothetical individual that the vocational expert considered. (*See* Pl.'s Mot. Summ. J. at 7-9.) In other words, Emmons says that the ALJ's hypothetical to the vocational expert was inaccurate, and, therefore, the expert's testimony about job availability does not lend substantial support to the ALJ's step-five conclusion.

In making this argument, Emmons repeats, verbatim, much of his credibility argument. (*Compare* Pl.'s Mot. at 5-6, *with* Pl.'s Mot. at 8.) In particular, he argues that the medical evidence pertaining to his lower-extremity edema shows that he is incapable of performing the restricted range of sedentary work set forth by the ALJ in the hypothetical to the vocational expert. (*See* Pl.'s Mot. Summ. J. at 8.)

The Court has already explained that much of the evidence Emmons cites is not proper for consideration on substantial evidence review. As to the remainder, for reasons already articulated, that evidence does not sufficiently undermine the ALJ's conclusion that Emmons could perform the demands of a restricted range of sedentary work. To briefly reiterate, Emmons received no treatment between October 2008 and January 2011 for his edema and, after January 2011, there are a number of objective test results that suggest that Emmons' lower-extremity vascular problems were not disabling.

Emmons further argues that the ALJ should have included a leg-elevation limitation in his hypothetical. (Pl.'s Mot. at 9.) But Emmons' primary support for this argument appears to be evidence that this Court cannot consider as it was not before the ALJ. (*See* Pl.'s Mot. at 8.) Among the records this Court can consider, it appears that only Dr. Ranger recommended elevation. But his two statements, "I also went over leg elevation with him" and "The use of anti-inflammatory medication and leg elevation was also advised" (Tr. 261, 266), are too vague for the Court to grant Emmons the relief he seeks. Dr. Ranger did not say how often or how long Emmons needed to elevate his legs, to what height, or what functional limitations Emmons would have if he did not elevate his legs. (*See id.*)

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that the ALJ did not reversibly err in assessing Emmons' credibility and that substantial evidence supports the ALJ's decision. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 15) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 19) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and

Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

                    s/Laurie J. Michelson
                    LAURIE J. MICHELSON
                    UNITED STATES MAGISTRATE JUDGE

Dated: November 18, 2013

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on November 18, 2013.

                    s/Jane Johnson
                    Deputy Clerk